UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTEN PLAISANCE, ROBBIE PLAISANCE, RICHIE CORLEY, CHARLES F. LEEKLEY, BRETT MORRIS, HENRY NEGRETTE, JIM NESBITT, CINDY SPARACINO, RICHARD SPARACINO, CHRISTIAN SCHICK, JACK GOSTL, SANTIAGO CORDOVEZ, FLOYD BONE, TOM HOWLAND, MICHAEL MERNAH, BEN A. SEALE, JOE SHUPAK, MARSHALL WHITMER, BILL WALTERS, and ROBERT ROIG,<br><br>               Plaintiffs,<br><br>       v.<br><br>JOHN D. SCHILLER, JR., D. WEST GRIFFIN, HILL A. FEINBERG, NORMAN M.K. LOUIE, WILLIAM COLVIN, DAVID M. DUNWOODY, CORNELIUS DUPRÉ II, KEVIN FLANNERY, SCOTT A. GRIFFITHS, JAMES LaCHANCE, UHY ADVISORS, INC., UHY LLP, UHY ADVISORS TX LLP, and BDO USA, LLP,<br><br>              Defendants | C.A. No. _____<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW, COMMON LAW FRAUD, AND BREACH OF FIDUCIARY DUTY**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs (collectively "Plaintiffs"), by their undersigned attorneys, allege as follows based upon personal knowledge as to themselves and their own acts and information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through their attorneys which included, among other things, a review of Defendants' public documents, announcements made by Defendants, their filings with the United States Securities and Exchange Commission ("SEC"), in wire and press releases published by and regarding Energy

XXI Ltd. ("EXXI" or the "Company"), securities analysts' reports and advisories about EXXI, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is an action by Plaintiffs, who purchased and held shares of EXXI between September 28, 2007, and December 30, 2016, to recover compensable damages caused by Defendants' violations of the federal securities law, their fraud, and their breaches of fiduciary duty.

2.      During EXXI's short existence, Defendants made or caused the Company to make false and misleading statements and omissions of material fact regarding the Company's financial and operating condition and prospects alleged herein in a reckless attempt to grow the Company, or at least create the illusion of growing the Company, primarily to support the lavish lifestyle and fanciful ambitions of its founder and Chief Executive Officer, Defendant John D. Schiller, Jr. ("Schiller"), and to conceal and cover up their own wrongdoing in recklessly managing the business and affairs of the Company.

3.      At all relevant times, Defendant Schiller lived substantially above his financial means, so much so that he was forced to take millions of dollars of improper and unauthorized loans from EXXI's business partners and his confederates on EXXI's Board of Directors (the "Board"), pledging his own EXXI common stock as collateral for the loans.

4.      Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that Defendant Schiller's personal wealth was virtually entirely dependent upon his personal investment in EXXI and his continued employment as President and Chief Executive Officer of the Company with the pay and perquisites attendant thereto.  That dependence,

coupled with Schiller's lavish lifestyle and over-spending habits, created a strong incentive for him to commit the wrongdoing alleged herein to (a) inflate the market value of EXXI common stock and (b) protect his job as President and Chief Executive Officer, all in order to protect his own wealth and personal income.

5.     Defendant Schiller and the other defendants committed the wrongful acts alleged herein, including (a) causing the Company to make ill-advised investments and a reckless acquisition to create the false illusion of growth, (b) improperly reporting the Company's financial results by accounting for purported hedges without adequate documentation, and (c) issuing false and misleading statements about the Company to perpetuate the illusion of growth and to conceal and cover up the Company's declining financial and operating condition and prospects.

6.     Eventually, after repeatedly assuring and reassuring public investors, and Plaintiffs in particular, that EXXI's financial and operating condition and prospects were sound, the Individual Defendants who were directors of the Company on April 16, 2016, authorized the Company's filing of a Chapter 11 petition in the Southern District of Texas after agreeing to a restructuring support agreement which was not presented to shareholders.

## JURISDICTION AND VENUE

7.     Some of Plaintiffs' claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over Plaintiffs' Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the remainder of the action

pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because: (a) one or more of the defendants resides or has his principal place of business within this district, (b) one or more of the defendants regularly conducts business within this district, (c) shares of EXXI's common stock were traded on the NASDAQ market within this district, and (d) some of the wrongful acts occurred within this district.

10.     In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiffs Kristen Plaisance, Robbie Plaisance, Richie Corley, Charles F. Leekley, Brett Morris, Henry Negrette, Jim Nesbitt, Cindy Sparacino, Richard Sparacino, Christian Schick, Jack Gostl, Santiago Cordovez, Floyd Bone, Tom Howland, Michael Mernah, Ben A. Seale, Joe Shupak, Marshall Whitmer, Bill Walters, and Robert Roig purchased and held shares of EXXI common and preferred stock on the open market at market prices at various times between September 28, 2007, and December 30, 2016, and suffered substantial damage as a result there.

12.     In reliance upon the integrity of the market for EXXI common stock and the honesty and accuracy of EXXI's and Defendants' public statements, in direct reliance upon EXXI's and Defendants' public statements, and without knowledge of the true facts regarding the Company's financial and operation conditions and prospects, purchased shares of EXXI

common and preferred stock at inflated market prices and held those shares between September 28, 2007 and December 30, 2016, when it was not prudent to do so, and suffered substantial economic loss thereby.

13.     At all times relevant hereto, and prior to its Chapter 11 bankruptcy reorganization on December 13, 2016, non-party EXXI is and was a company formed under the laws of Bermuda with its principal place of business in Houston, Texas. EXXI was previously known as Energy XXI (Bermuda) Ltd. until its name was changed pursuant to a shareholder vote at the Company's annual meeting on November 4, 2014.

14.     At all times relevant hereto, and prior to its bankruptcy reorganization, EXXI is and was an independent oil and natural gas exploration and production company, engaged primarily in the acquisition, exploration, development and operation of oil and natural gas properties onshore in Louisiana and Texas and offshore in the Gulf of Mexico Shelf ("GOM Shelf").

15.     At all times relevant hereto, and prior to its commencement of Chapter 11 bankruptcy proceedings on April 14, 2016, shares of EXXI's common stock were traded in an orderly and efficient market on the NASDAQ Global Select Market ("NASDAQ") under the symbol "EXXI."

16.     Trading on EXXI's common stock was suspended on April 25, 2016, and EXXI's common stock was formally delisted from NASDAQ on May 19, 2016.

17.     Since April 25, 2016, EXXI's common stock has traded on the OTC Markets Group Inc.'s OTC Pink (the "OTC Pink") under the symbol "EXXIQ." The shares currently have no value.

18.     The Company emerged from bankruptcy on December 30, 2016, and is now a

Delaware corporation known as Energy XXI Gulf Coast, Inc. ("EGC"), formerly an indirect wholly-owned subsidiary of EXXI. As a result of the Company's Chapter 11 bankruptcy restructuring, EGC became the successor to EXXI.

19.    Following the Company's Chapter 11 reorganization, EGC's common stock now trades on the NASDAQ national market under the symbol "EXXI."

20.    Defendant Schiller founded EXXI in 2005 and served as its President, Chief Executive Officer, and a member of the Board of Directors ("Board") from the Company's inception through and including on or about February 2, 2017. On that date, the Company announced the termination of Schiller's employment as President and Chief Executive Officer and as a member of the Board in a Current Report filed with the SEC on Form 8-K.

21.    As Chairman of the Board and Chief Executive Officer of EXXI, Defendant Schiller signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A.

22.    From EXXI's founding in 2005 through and including October 15, 2015, Defendant Schiller also served as Chairman of the Board. He was stripped of that title by the Board on October 9, 2015, following an internal investigation that found he borrowed funds in 2007, 2009, and 2014 from personal acquaintances or their affiliates, certain of whom provided the Company and certain of its subsidiaries with services, and in 2014 he personally borrowed $3 million from Defendant Norman Louie ("Louie"), before Louie was appointed to the Board effective December 15, 2014.  At the time of the loan from Louie, Louie was a managing director at Mount Kellet Capital Management, LP, one of the Company's largest shareholders. The internal investigation was prompted by an SEC inquiry.

23.    A fixture on the Houston social scene for years, Defendant Schiller lived a lavish lifestyle, far outspending his considerable income and wealth. Even before the rest of the Board

learned of Schiller's improper personal loans, his associates worried that he had become overextended by his extravagant spending habits.

24.     Defendant Schiller failed to disclose the personal loans to the Board, a clear violation of the Company's Code of Business Conduct and Ethics, which required Schiller to disclose any potential conflicts of interest, including related party transactions, for review by senior management in consultation with the Board.

25.     Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that one or more of Defendant Schiller's loans, including the loan from Defendant Louie, was secured by his EXXI stock, which he pledged as collateral for the loans.

26.     Plaintiffs were unaware of the loans given to Defendant Schiller and had no reason to know of the loans when they were made.

27.     Between 2011 and 2015, as President and Chief Executive Officer of EXXI, Defendant Schiller's total compensation ranged from $6,638,772 to $14,502,384 (in the year in which the Company acquired EPL Oil & Gas, Inc. ("EPL")).

28.     As evidenced by Defendant Schiller's extraordinary loans from some of EXXI's vendors and from Defendant Louie, a shareholder of the Company and a confederate on the Board, Schiller's lifestyle far exceeded his actual wealth.

29.     In addition to his pay and other compensation, Schiller, whose preference for a lavish lifestyle above and beyond his personal financial means was well-known at all relevant times, also enjoyed the emoluments of those high positions at the expense of the Company.

30.     Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will also show that the Company paid many of Schiller's personal living expenses.

31.     Chief among Defendant Schiller's personal expenses paid by the Company was

for a 350-acre ranch in College Station, Texas, called Schiller Ranch, owned in part by Schiller and in part by a trust for his children.

32.     The Company also paid extravagant sums to support Defendant Schiller's lavish lifestyle while supposedly at work. For example, the Company maintained a bar, called the "Denny Crane Room" – after William Schatner's over-the-top character in the TV series *Boston Legal* – at its Houston headquarters stocked with premium Scotches and imported cigars for Schiller's personal enjoyment at all hours of the day and night. Indeed, an article published in *Forbes* in December 2010 described the bar as "filled with rare single malts" and depicted Schiller with a "Lagavulin and Davidoff in hand . . .  slid[ing] open a glass wall, transforming the room into an open-air patio 29 stories above downtown."

33.     During the course of his employment, including vested options and restricted shares, Defendant Schiller owned between 1.3 and 7.7 million shares of the Company's common stock, representing between 1.3% and 4.9% of the outstanding shares. At all relevant times, Defendant Schiller was one of the Company's largest shareholders.

34.     Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that at all relevant times, Defendant Schiller's net worth was dependent upon his investment in EXXI stock and options. That dependence, coupled with Schiller's lavish lifestyle and over-spending habits, was a strong incentive for him to commit the wrongdoing alleged herein to (a) inflate the market value of EXXI common stock and (b) protect his job as President and Chief Executive Officer of the Company.

35.     Defendant D. West Griffin ("Griffin") co-founded EXXI with Defendant Schiller in 2005 and served as the Company's Chief Financial Officer from its inception through and including on or about October 20, 2014. During his employment as Chief Financial Officer,

Griffin signed the Company's quarterly and annual reports filed with the SEC on Forms 10-Q, 10-K, and 10-K/A.

36.    The Company announced Griffin's resignation in a press release and a Current Report filed with the SEC on Form 8-K/A on that date, which coincided with the resignation of UHY LLP ("UHY") as the Company's independent registered public accounting firm effective December 1, 2014, when the Texas practice of UHY, which provided independent public accounting services to the Company, was acquired by BDO USA, LLP ("BDO").

37.    Between 2011 and 2014, as Chief Financial Officer of EXXI, Defendant Griffin's total compensation ranged from $2,541,080 to $5,145,080 (in the year in which the Company acquired EPL).

38.    During the course of his employment, including vested options and restricted shares, Defendant Griffin owned between 250,000 and 1 million shares of the Company's common stock. At all relevant times, Defendant Griffin was one of the Company's largest shareholders.

39.    Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that at all relevant times, Defendant Griffin's net worth was dependent upon his investment in EXXI stock and options. That dependence was a strong incentive for him to commit the wrongdoing alleged herein to (a) inflate the market value of EXXI common stock and (b) protect his job as Chief Financial Officer of the Company.

40.    Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that Defendant Griffin resigned over a disagreement regarding the Company's financial disclosures, including those related to its ultra-deep investments and accounting for its acquisition of EPL.

41.     Defendant Louie was appointed to the Board, effective December 15, 2014, by Defendant Schiller and the rest of the Board without election by shareholders, to stand for election by shareholders at the 2015 annual meeting. When Defendant Schiller's secret loan from Defendant Louie was discovered, the Board determined not to nominate Defendant Louie for election as a director at the 2015 annual meeting.

42.     During his short tenure on the Board, Defendant Louie signed the Company's Amended 2014 annual report filed on Form 10-K/A with the SEC on December 23, 2014.

43.     Defendant James LaChance ("LaChance") was also appointed to the Board, effective December 15, 2014, by Defendant Schiller and the rest of the Board without election by shareholders, to stand for election by shareholders at the 2015 annual meeting. As a member of the Board, LaChance signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A.

44.     The appointment of Defendants Louie and LaChance to the Board increased the size of the Board from seven to nine directors.

45.     Defendant William Colvin ("Colvin") was a director of EXXI at all relevant times. Colvin served as Chairman of the Audit Committee and a member of the Nomination and Governance Committee of the Board throughout his tenure on the Board. As a member of the Board, Colvin signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A.

46.     Defendant Kevin Flannery ("Flannery") was a director of EXXI at all relevant times. Flannery served as a member of the Audit Committee and the Nomination and Governance Committee of the Board throughout his tenure on the Board. As a member of the Board, Flannery signed the Company's annual reports filed with the SEC on Form 10-K and 10-

K/A.

47.     Defendant David M. Dunwoody ("Dunwoody") was a director of EXXI at all relevant times until EXXI's the annual meeting on November 5, 2013. During his tenure on the Board, Dunwoody served as Chairman of the Remuneration Committee and a member of the Audit Committee. As a member of the Board, Dunwoody signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A.

48.     Defendant Scott A. Griffiths ("Griffiths") was a director of EXXI at all relevant times since June 2014, when he was appointed to the Board. Griffiths served as a member of the Audit Committee and the Compensation Committee of the Board throughout his tenure on the Board. As a member of the Board, Griffiths signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A.

49.     Defendant Hill A. Feinberg ("Feinberg") was a director of EXXI at all relevant times. Feinberg served as Chairman of the Nomination and Governance Committee and a member of the Compensation Committee of the Board throughout his tenure on the Board and as Lead Independent Director since 2011. In his capacity as Lead Independent Director, Feinberg was an *ex officio* member of the Audit Committee. As a member of the Board, Feinberg signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A.

50.     Defendant Cornelius Dupré II ("Dupré") was a director of EXXI at all relevant times. Dupré served as Chairman of the Compensation Committee and a member of the Nomination and Governance Committee of the Board throughout his tenure on the Board. As a member of the Board, Dupré signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A.

51.     At all relevant times, EXXI's Audit Committee recommended the annual

11

appointment of the Company's independent registered public accounting firm, with whom it reviewed the scope of audit and non-audit assignments and related fees, and reviewed the Company's accounting principles used in financial reporting, its internal auditing procedures, and the adequacy of its internal control procedures.

52.     At all relevant times, EXXI's Compensation Committee evaluated the performance of the Company's officers, reviewed overall management compensation and benefits policies, and reviewed and recommended employee benefits plans, options and restricted share grants and other incentive arrangements.

53.     At all relevant times, the primary purpose of EXXI's Nomination and Governance Committee was to identify individuals qualified to become members of the Board and recommend such individuals to the Board for nomination for election, make recommendations to the Board concerning committee appointments, and provide oversight of the corporate governance affairs of the Board and the Company, including the Code of Business Conduct and Ethics.

54.     At all relevant times, as senior executive officers and (in Schiller's case) as a director of EXXI and its subsidiaries and affiliates, Defendants Schiller and Griffin were privy to material non-public information concerning the Company's business, operations, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, Defendants Schiller and Griffin knew or recklessly disregarded the fact that the material adverse facts alleged herein had not been disclosed to, and were being concealed from, the investing

public generally and Plaintiffs in particular.

55.     Defendants Schiller and Griffin participated in the drafting, preparation, or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

56.     Because of their executive and managerial position with EXXI and (in Schiller's case, his position on the Board), Defendants Schiller and Griffin had access to the adverse undisclosed information about EXXI's financial and operating condition, performance, and prospects as alleged herein and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about EXXI and its business materially false and misleading.

57.     Defendants Schiller, Griffin, Feinberg, Louie, Colvin, Dunwoody, Dupré, Flannery, Griffiths, and LaChance are collectively referred to herein as the "Individual Defendants."

58.     Defendant UHY Advisors, Inc. ("UHY Advisors"), is one of the top professional services firms in the United States.  Through its subsidiaries, UHY provides a range of tax and business consulting service.

59.     Defendant UHY LLP ("UHY LLP") is a licensed independent certified public accounting firm that performs audit and other attest services in an alternative practice structure with Defendant UHY Advisors and its subsidiary entities, including UHY Advisors TX LLP ("UHY TX").

60.     Defendants UHY Advisors and UHY collectively (referred to herein as "UHY") provide comprehensive audit, attest, tax, and business advisory services to a wide range of

publicly traded and privately held companies across the country, primarily in the middle market.

61.     Defendant BDO USA, LLP ("BDO") is a limited liability partnership formed under the laws under Delaware law. With headquarters in Chicago and more than 60 offices located in all major United States cities, BDO is a professional accounting services firm providing accounting, assurance, audit, tax, financial advisory, and consulting services to publicly traded and privately held companies.

62.     Defendant UHY TX is a limited liability partnership and subsidiary of Defendant UHY LLP. UHY TX was a licensed independent certified public accounting firm that performed audit and other attest services for UHY in Houston at all times relevant hereto until it was acquired by Defendant BDO on or about December 1, 2014.

63.     On or about December 1, 2014, Defendant BDO acquired the Texas practice of UHY LLP, operated by UHY TX, including UHY TX's offices in Houston and Dallas, where BDO now operates. Plaintiffs do not know, and have no way to know, if BDO succeeded to UHY's liabilities for its Texas practice, including in connection with the services that UHY provided to EXXI, as a result of that acquisition. BDO is sued only to the extent it did so.

## SUBSTANTIVE ALLEGATIONS

### A.     The Company

64.     EXXI was founded by Defendants Schiller and Griffin in Houston, Texas in 2005 to acquire, explore, develop, and operate oil and natural gas properties onshore in Louisiana and Texas and offshore in the GOM Shelf.

65.     The Company was funded through a $300 million initial public offering of its common stock, which traded on the London Stock Exchange Alternative Investment Market ("AIM").

66.     During its short existence, EXXI aggressively promoted its purported "'acquire and exploit' growth strategy" of emphasizing acquisitions to enhance its organic drilling program.

67.     After a reasonable opportunity for discovery, Plaintiffs believe the evidence will show that EXXI needed to acquire producing wells to increase the Company's cash flow even if they were bundled with other, less desirable assets

68.     As an oil and gas company, the market price for the Company's common stock was highly dependent upon the market prices for oil and natural gas, the Company's stated reserves, and its stated revenue from oil and natural gas operations.

69.     Between 2006 and 2010, EXXI completed five major acquisitions in rapid succession for aggregate cash consideration of approximately $2.5 billion. First, the Company acquired Marlin Energy, L.L.C. (''Marlin'') in February 2006 for total cash consideration of approximately $448.4 million. Next, in June 2006, the Company acquired certain Louisiana Gulf Coast producing properties from affiliates of Castex Energy, Inc. (''Castex'') for approximately $312.5 million in cash. Just one year later, in June 2007, the Company purchased certain Gulf of Mexico shelf properties (the ''Pogo Properties'') from Pogo Producing Company for approximately $415.1 million. In November 2009, the Company acquired certain Gulf of Mexico shelf oil and natural gas interests from MitEnergy Upstream LLC (''MitEnergy''), a subsidiary of Mitsui & Co., Ltd., for total cash consideration of $276.2 million. And then in December, 2010, the Company acquired certain shallow-water Gulf of Mexico shelf oil and natural gas interests from affiliates of Exxon Mobil Corporation (''ExxonMobil'') for cash consideration of $1.01 billion (the ''ExxonMobil Acquisition'').

70.     Because the market price for EXXI's common stock was highly dependent upon

the market prices for oil and natural gas, the Company's stated reserves, the acquisitions, which increased the size of the Company's stated reserves, substantially affected its market price.

71.    The Company completed those acquisitions primarily through borrowing or debt financing, thus taking on a substantial debt burden.

72.    Following EXXI's acquisition of the POGO properties, on July 31, 2007, EXXI announced that its common shares were approved for trading in the United States on the NASDAQ national exchange. The Company's shares continued to trade on the AIM in London.

73.    On August 12, 2011, EXXI's common stock was listed for trading on the NASDAQ Global Select Market, a segment of the NASDAQ Global Market with the highest initial listing standards of any exchange in the world, under the symbol "EXXI."

74.    To be listed on the NASDAQ Global Select Market, EXXI had to meet certain minimum requirements for revenue and earnings, number of shares traded, share price, and market capitalization, and needed at least three market makers. Because many institutional investors are prohibited from investing in companies that do not meet those (or similar) minimum requirements, listing on the NASDAQ Global Select Market gave EXXI greater access to capital and increased market liquidity.

75.    Plaintiffs believe that, after a reasonable opportunity for discovery, EXXI would not have met the minimum listing requirements for the NASDAQ Global Select Market but for the Company's use of cash flow hedge accounting.

76.    However, pursuant to ASC Topic 815, Derivaties and Hedging, the Company lacked the necessary documentation for its hedging program to utilize cash flow hedge accounting treatment and, in September 2015, following a change in independent auditors, the Company was required to restate more than four years of financial statements to eliminate the

use of cash flow hedge accounting treatment from them.

77.     EXXI common stock was cancelled for trading on the AIM in London on or about December 14, 2014, by action of the Board taken pursuant to a shareholder vote at the annual meeting on November 4, 2014.

78.     On April 20, 2016, EXXI was informed by the Listing Qualifications Department of NASDAQ that its stock would be delisted from NASDAQ for failure to meet minimum listing qualifications.

79.     On April 16, 2016, faced with mounting debt and declining revenue, EXXI filed a voluntary Chapter 11 bankruptcy petition in the Southern District of Texas for protection from its creditors.

80.     On December 13, 2016, the Bankruptcy Court for the Southern District of Texas approved EXXI's amended plan of reorganization.

**B.      EXXI's Financial Statements**

81.     EXXI's quarterly and annual financial statements since 2011, including those financial statements it was required to restate, did not fairly present the Company's financial condition and results of operations in each of those accounting periods.

82.     In fact, on September 8, 2015, EXXI issued a press release and filed a Current Report on Form 8-K with the SEC in which it announced that the Company's previously issued consolidated financial statements for the years ended June 30, 2011, 2012, 2013 and 2014 and for the quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014, should no longer be relied upon and would be restated.

83.     On September 29, 2015, EXXI filed its delayed 2015 Annual Report on Form 10-K with the SEC. The Company's 2015 Annual Report included the restated financial statements

for the years ended June 30, 2011, 2012, 2013 and 2014 and for the quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014. Before being restated, those financial statements, including the financial statements for the years ended June 30, 2011, 2012, 2013, and 2014, materially misstated the Company's financial condition and results of operations and were not prepared in accordance with generally accepted accounting principles ("GAAP").

84.     Defendants failed to abide by PCAOB standards as well as U.S. GAAP and generally accepted auditing standards ("GAAS"), thereby materially misleading and harming Plaintiffs and other public investors who reasonably relied upon them.

85.     The auditing practices employed by Defendants in connection with the audit were so deficient as to amount to no audit at all, and an egregious refusal to see the obvious and to investigate the doubtful. The GAAP violations involved no accounting judgment, and the unqualified opinions were such that no reasonable auditor would have issued the same opinions if confronted with the same facts.

86.     Each year, in connection with EXXI's annual report filed on Form 10-K with the SEC and publicly disclosed, UHY issued a Report of Independent Registered Public Accounting Firm ("Audit Report") to the Board and the public Company's stockholders. In each Audit Report, UHY represented that it audited the Company's financial statements "in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

87.     In each Audit Report, UHY represented that it "we plan[ned] and perform[ed] the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects."

88.     In each Audit Report, UHY stated: "In our opinion, Energy XXI (Bermuda)

Limited and subsidiaries maintained, in all material respects, effective internal control over financial reporting" for the year in question.

89.     In its 2011 Audit Report, dated August 15, 2011, UHY issued an unqualified audit opinion, as follows:

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Energy XXI (Bermuda) Limited and subsidiaries as of June 30, 2011 and 2010, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three fiscal years in the period ended June 30, 2011, and our report dated August 15, 2011 expressed an unqualified opinion on those consolidated financial statements.

90.     In its 2012 Audit Report, dated August 9, 2012, UHY issued an unqualified audit opinion, as follows:

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Energy XXI (Bermuda) Limited and subsidiaries as of June 30, 2012 and 2011, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three fiscal years in the period ended June 30, 2012, and our report dated August 9, 2012 expressed an unqualified opinion on those consolidated financial statements.

91.     In its 2013 Audit Report, dated August 21, 2011, UHY issued an unqualified audit opinion, as follows:

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Energy XXI (Bermuda) Limited and subsidiaries as of June 30, 2013 and 2012, and the related consolidated statements of income, comprehensive income (loss), stockholders' equity and cash flows for each of the three fiscal years in the period ended June 30, 2013, and our report dated August 21, 2013 expressed an unqualified opinion on those consolidated financial statements.

92.     In its 2014 Audit Report, dated August 25, 2011, UHY issued an unqualified audit opinion, as follows:

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of

Energy XXI (Bermuda) Limited and subsidiaries as of June 30, 2014 and 2013, and the related consolidated statements of income, comprehensive income (loss), stockholders' equity and cash flows for each of the three fiscal years in the period ended June 30, 2014, and our report dated August 25, 2014 expressed an unqualified opinion on those consolidated financial statements.

93.     UHY consented to the incorporation of its Audit Reports regarding EXXI's financial statements in the Company's annual reports and amended annual reports filed with the SEC on Form 10-K or Form 10-K/A and disseminated to the public each year.

94.     UHY's unqualified audit reports were materially false and misleading because, among other things: (a) the audits were not conducted in accordance with PCAOB standards; and (b) EXXI's financial statements did not fairly present the Company's true financial position and results of operations and did not comply with GAAP.

95.     EXXI's financial statements did not fairly present the Company's financial position and did not comply with GAAP because SEC regulations and GAAP require disclosure of material related party transactions as follows:

a)  GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

b)  GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

c)  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

d)  SEC and NASDAQ rules and regulations require that publicly traded companies such as EXXI include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.  See Section 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

e)  SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1)  (emphasis added).

f)  GAAP Statement of Financial Accounting Standards ("SFAS") and SEC regulation S-K required the Company to disclose all material related party transactions.

g) SFAS No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57, ¶ 2; 850-10-50-1.

h) "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57, ¶ 1; 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company.  SFAS No. 57, ¶ 24(a, b); 850-10-20.

i) Disclosures of related party transactions shall include: (i) the nature of the relationship involved; (ii) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements; (iii) the dollar amount of transactions for each of the periods for which income statements are presented; and (iv) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57, ¶ 2; 850-10-50-1.

96.    The Company's financial statements did not comport with GAAP as they failed to disclose the millions of dollars in loans to Defendant Schiller from EXXI's vendors and from a confederate on the Board who was also an affiliate of one of the Company's largest shareholders.

97.    Contrary to the Audit Report, the audit was not conducted in accordance with PCAOB standards. In particular, PCAOB Standard AU § 316 sets forth certain fraud risks or red flags, including: (a) unsupported balances or transactions; (b) inconsistent, vague or implausible responses from management arising from inquiries or analytical procedures; (c) lack of timely and appropriate documents; (d) missing documents; and (e) evasive or unreasonable responses of management to audit reports.

C.    **Ultra-Deep Gas Exploration**

98.    During its early years, even following the five rapid acquisitions between 2006 and 2010, the Company focused its core operations in the shallow waters of the Gulf of Mexico shelf off the coast of Louisiana, including five of the 11 largest oil fields ever discovered on the shelf: West Delta 30, Grand Isle 16, West Delta 73, South Timbalier 21 and South Pass 89.

21

99.     In 2008, Defendants caused EXXI to enter into a joint venture with McMoRan Exploration Company ("McMoRan") to explore for ultra-deep natural gas reserves in and around the Gulf of Mexico below the salt/saltweld on the shelf (depths in excess of 20,000 feet and water depths of less than 150 feet) and onshore (depths in excess of 20,000 feet). The Company said its ultra-deep exploration was targeted for fields that it believed would have potential for significant reserves.

100.    The McMoRan joint venture, in which EXXI had (in which EXXI claimed to have "various interests") identified five such "targets": the Davy Jones discovery well, the Davy Jones Offset well, the Blackbeard East, Lafitte, and Blackbeard West wells, and Lineham Creek.

101.    On January 11, 2010, EXXI issued a press release announcing a discovery at Davy Jones. In the press release, Schiller stated that "[t]he Davy Jones discovery verifies the ultra-deep potential of the Gulf of Mexico shelf and opens this horizon as a major exploration frontier."

102.    According to multiple press reports, the Davy Jones was discovery believed to be one of the most important natural gas discoveries in the Gulf of Mexico in decades.

103.    The market price for EXXI common stock rose dramatically as a result of the press release because of the size and importance of the Davy Jones discovery.

104.    On August 9, 2010, EXXI issued a press release stating as follows:

"We added nearly four times as many reserves as we produced during the year," Energy XXI Chairman and CEO John Schiller said. "Notably, our success drilling for ultra-deep exploration targets on the shallow-water Gulf of Mexico shelf is expected to drive major additional future increases."

105.    Defendants also caused the Company to state the following in the press release:

NSAI estimated the Davy Jones discovery on South Marsh Island Block 230 in 20 feet of water offshore Louisiana holds as much as 841 million BOE (104 BOE net to company) of contingent and prospective resources based on data obtained to-

date. Additional data or a flow test of the well may be required before the contingent resources can be moved to the proved, probable or possible reserved categories, and future drilling activity could add significantly to the discovery's size.

106.    Based upon the price of natural gas at the time of the press release, the 104 BOE net would have been worth approximately $2.5 billion to EXXI.

107.    In a letter to shareholders on October 1, 2010, signed by Schiller and included with EXXI's 2010 Annual Report filed with the SEC on September 8, 2010, Defendants caused the Company to state as follows:

[O]ur ultra-deep shelf successes at Davy Jones and Blackbeard West, which our third-party auditors estimated could hold as much as 130 million BOE of contingent and prospective resources, net to Energy XXI.

108.    Based upon the price of natural gas at the time of Schiller's letter, the 130 BOE net would have been worth approximately $3.2 billion to EXXI.

109.    On June 16, 2011, EXXI issued a press release in which Defendants caused the Company to state as follows:

The well [Davy Jones offset well or Davy Jones 2] is being readied for production once equipment has been procured, with expected first production to occur during the second quarter of calendar 2012.

110.    On August 10, 2011, EXXI issued a press release in which Defendants caused the Company to state as follows:

Netherland, Sewell & Associates, Inc. (NSAI), independent oil and gas reserve engineers, estimated that Davy Jones, Blackbeard East and Blackbeard West structures hold as much as 1.2 billion BOE (162 million BOE net to the company) of combined contingent and prospective resources based on data obtained to-date. Additional data or flow tests will be required before the contingent resources can be moved to the proved, probably or possible reserve categories, and future drilling activity could add significantly to field sizes.

111.    Based upon the price of natural gas at the time of the press release, the 162 BOE net to EXXI was worth approximately $4.1 billion.

112.    On February 1, 2012, EXXI issued a press release in which Defendants caused the

Company to state as follows:

> Completion activities at the Davy Jones No. 1 discovery well at South Marsh
> Island Block 230 are in an advanced stage. The wellbore has been cleaned out to
> total depth and drilling mud has been displaced with completion fluid. Current
> expectations are to perforate and flow the well during the March quarter.
> Installation of the central processing facility, production platform and sales
> pipelines has been completed. First production from the well could be established
> shortly after a successful flow test.

113.    On February 1, 2012, EXXI issued a press release in which Defendants caused the

Company to state as follows:

> Completion activities at the Davy Jones No. 1 discovery well at South Marsh
> Island Block 230 are in an advanced stage.  The wellbore has been cleaned out to
> total depth and drilling mud has been displaced with completion fluid.  Current
> expectations are to perforate and flow the well during the March quarter.
> Installation of the central processing facility, production platform and sales
> pipelines has been completed.  First production from the well could be established
> shortly after a successful flow test.

114.    On May 2, 2012, EXXI issued a press release in which Defendants caused the

Company to state as follows:

> Within the shallow-water, ultra-deep Gulf of Mexico shelf program, the Davy
> Jones discovery well on south Marsh Island Block 230 was completed in March
> 2012 and work in ongoing to establish commercial production from the
> well….The company expects that the operations currently under way will enable a
> measurable flow rate during the second calendar quarter of 2012 followed by
> commercial production shortly thereafter.

115.    On July 31, 2012, EXXI issued a press release in which Defendants caused the

Company to state as follows:

> In June 2012, 165 feet of Wilcox sands in the Davy Jones discovery well were
> successfully perforated with electric wireline casing guns.  Completion activities
> are continuing and a flow test is expected in August with commercial production
> expected shortly thereafter.

116.    In a Letter to Shareholder signed by Defendant Schiller and included with EXXI's

2012 Annual Report filed on Form 10-K with the SEC on August 9, 2012, Defendants caused the

Company to state as follows:

> We are also optimistic that results achieved within our "ultra-deep" joint venture
> with operator McMoRan, have well positioned us for the future. New discoveries
> at both Lafitte and Blackbeard East have further ***de-risked the ultra-deep
> program***. Pursuing the trend from the shallow-water shelf onto the Louisiana
> coast portends more exciting results for 2013. [Emphasis added.]

117.   In its 2012 Annual Report, Defendants also caused the Company to report as

follows:

> the McMoRan-operated group . . . has identified approximately 15 ultra-deep
> prospects in shallow water near existing infrastructure. In addition we will
> participate in three onshore ultra-deep prospects located in South Louisiana. The
> group's current sub-salt drilling plans include 2 to 3 exploratory wells. We have
> participated in 7 wells to date with our participations ranging from approximately
> 9% to 20%. Of these wells, one has been temporarily abandoned pending further
> evaluation, three are temporarily abandoned pending facilities and completions,
> two are currently drilling and one is currently being tested. We target to spend
> less than 10% of our budgeted cash flow on our exploration activities on the ultra-
> deep trend.

118.   In its 2012 Annual Report, Defendants also caused the Company to report as

follows:

> For fiscal 2013, the company has budgeted $94 million to the ultra-deep program
> with McMoRan. Much of the $94 million will be allocated to development
> activities, including the completion of the Davy Jones discovery well and the
> Davy Jones offset well. Exploration continues at the Blackbeard West Shallow
> well, targeting Miocene age sands seen at Blackbeard East. The partnership also is
> participating in Lineham Creek, a well operated by Chevron U.S.A. Inc. onshore
> south Louisiana, and will shortly spud the nearby Lomond North prospect in the
> Highlander area.

119.   On November 7, 2012, EXXI issued a press release in which Defendants caused

the Company to state as follows:

> Within the shallow-water ultra-deep exploration program with McMoRan, the Davy
> Jones discovery well is proceeding toward first production and the company is
> participating in the Blackbeard West #2, Lomond North and Lineham Creek wells.

The Davy Jones discovery well, the first shallow-water, ultra-deep sub-salt completion on the Gulf of Mexico shelf, is being completed.  The wellbore was cleaned out to enable testing of all 165 feet of perforated sands in the Wilcox and the final steps of installing the wellhead are underway.  Once these steps are complete, flow testing is expected to commence.  Energy XXI holds a 15.8 percent working interest (12.6 percent net revenue interest) in the Davy Jones discovery well. Total net investment in Davy Jones #1 through Sept. 30, 2012 was approximately $87.6 million.

Completion and testing of the Davy Jones offset appraisal well (Davy Jones #2) is expected to commence following review of results from the Davy Jones discovery well.

120.    According to press reports, Davy Jones 1 began production testing shortly after the November 7, 2012 press release. However, EXXI did not issue any public statement about the results of the November, 2012 production testing.

121.    On January 20, 2013, EXXI issued a press release in which Defendants caused the Company to state as follows:

Within the shallow-water ultra-deep exploration program with McMoRan, at the Davy Jones discovery well [Davy Jones 1], the rig is being moved off location for several months while a large-scale hydraulic fracture treatment is designed to penetrate the Wilcox reservoirs.

122.    Over the next several months, EXXI issued numerous press releases.  However, those press releases barely mentioned EXXI's ultra-deep exploration program.

123.    In its 2013 Annual Report filed with the SEC on August 21, 2013, Defendants caused the company to state that "work is ongoing to establish commercial production" from Davy Jones No. 1. However, when the statement was made, Defendants knew that Davy Jones No. 1 was not commercially viable.

124.    At an Oil & Gas conference on October 17, 2013, Schiller said that Davy Jones 1 was "too deep and too narrow to flow gas" but Schiller falsely stated that Davy Jones 2 had a "high probability" of producing and that completion of Davy Jones 2 was expected to start in December, 2013.

125.    In its quarterly report for the period ended September 30, 2013, filed on Form 10-Q with the SEC on October 30, 2013, Defendants caused the Company to state the following:

| Project Name | Cost | Status |
|---|---|---|
| Davy Jones No. 1 | $108.9 | Work ongoing to establish commercial production. |
| Davy Jones Offset Appraisal Well [Davy Jones No. 2] | 45.1 | Operations to commence completion are expected during the calendar year 2014. |
| Blackbeard West | 57.1 | Completion using conventional technologies planned during second quarter of calendar year 2014 |
| Blackbeard East | 50.7 | Plans to begin development of the shallow zones in late calendar year 2014 |

126.    In its quarterly report for the period ended December 31, 2013, filed on Form 10-Q with the SEC on February 7, 2014, Defendants caused the company to state that "work is ongoing to establish commercial production" from Davy Jones 1 and that "[o]perations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014."

127.    In its quarterly report for the period ended March 31, 2014, filed on Form 10-Q with the SEC on May 1, 2014, Defendants failed to mention Davy Jones 1, but maintained that Davy Jones 2 was "in the process of being completed."

128.    Despite the steady release of positive and optimistic statements from EXXI, the Company's ultra-deep investment never paid off and never appeared likely to pay off.

129.    In fact, only one of the 15 ultra-deep "prospects" referred to by the Company ever produced any natural gas.

130.    According to a former EXXI employee responsible for the Company's reserve accounting, when the Davy Jones 2 well was tested, it only produced water, not natural gas. This material adverse fact, though known by EXXI and Defendants, was not timely disclosed to

investors, including Plaintiffs in particular.

131.   According to the former EXXI employee, Defendant Schiller pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the amount of reserves reported in the Company's quarterly and annual financial statements. This led to internal confrontations over accounting policies and practices.

132.   Although the unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program were not included in any of the Company's financial statements, the pressure from Defendant Schiller and the confrontations it led to created mistrust between the Company's internal accountants and senior management.

133.   In the second half of 2013, as the investing public grew tired of waiting for production from the Company's ultra-deep investments, and by no later than October 17, 2013, when Defendant Schiller made his negative comments regarding the Davy Jones 1 well, the market price for EXXI common stock began to trade at a substantially reduced price relative to its peers.

**D.   EPL Acquisition**

134.   Prior to mid-2013, buoyed by the constant stream of positive statements from EXXI about its ultra-deep gas investment, the market price for EXXI common stock traded at or above the market prices of its peers, including Carizo Oil and Gas Inc. and Cimarex Energy Co.

135.   After entering into the ultra-deep joint venture, EXXI continued to experience a period of prolonged stagnant organic growth in production and declining market prices for its common stock.

136.   As shown in the following chart (prepared from publicly available share price data

provided by Bloomberg), even taking into consideration fluctuations in oil and gas prices, EXXI common stock traded far below the range of its peers after mid-2013:



137.   In response to that stagnant growth and price decline, Defendants caused the Company to pursue its largest acquisition in early 2014, deciding to buy EPL.

138.   Founded in 1998, EPL was (like EXXI) an independent oil and natural gas exploration and production company headquartered in Houston, Texas, and it concentrated its operations in the U.S. Gulf of Mexico shelf, focusing on the state and federal waters off the coast of Louisiana.

139.   As part of its aggressive growth strategy, EXXI had considered acquiring EPL on several occasions prior to 2014. On those various occasions, however, EXXI's management determined that EPL was overpriced and elected not to pursue an acquisition.

140.   In the proxy for the EPL acquisition filed in Schedule14A with SEC on April 21, 2014, the Company acknowledged that its Board had considered a strategic transaction with EPL

in January 2013 but determined not to proceed at that time.

141.   Plaintiffs believe that after a reasonable opportunity for discovery, the evidence will show that as part of EXXI's aggressive growth strategy, in 2012 the Company offered to buy oil and gas assets in the Gulf of Mexico from another company, Hilcorp Energy GOM Holdings LLC ("Hilcorp"), for $500 million.

142.   In September 2012, Hilcorp sold those same oil and gas assets to EPL for $550 million, a price above what EXXI's Board determined was the fair value for the assets. As a result of that acquisition, EPL approximately doubled the size of its reserves.

143.   EXXI had created an "acquisition team" to identify, review, evaluate, consider, and recommend acquisitions. Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that despite the experience gained by the "acquisition team" from completing five major acquisitions for aggregate cash consideration of approximately $2.5 billion between 2006 and 2010, to avoid any delay or possible impediment to the transaction, Defendant Schiller bypassed the "acquisition team" entirely in connection with the EPL acquisition and pursued the transaction without customary and reasonable due diligence.

144.   Rather, to respond to public investors' concerns over the Company's stagnant growth and price decline, and feeling growing pressure from his own financial circumstances, Defendant Schiller rushed through with the EPL acquisition, causing the Company to buy EPL at an inopportune time and to over-pay for EPL.

145.   Because Defendant Schiller by-passed the "acquisition team," EXXI acquired EPL without adequately identifying and valuing its assets, over-paid for those assets, and did not acquire assets as the Company expected.

146.   In a press release issued on March 12, 2014, and on a Current Report on Form 8-

K filed with the SEC on March 13, 2014, Defendants caused EXXI to announce it had entered

into a definitive agreement (the "EPL Acquisition Agreement") to acquire all the outstanding

shares of EPL, for total consideration of $2.3 billion, comprised of $1 billion in cash and

approximately 23.4 million common shares of EXXI stock plus the assumption of EPL's debt.

147.    In the press release, Defendants caused EXXI to state that the acquisition would

make it "the largest public independent [oil and gas] producer on the Gulf of Mexico shelf, with

production of approximately 65,000 barrels of oil equivalent (BOE) per day, 70 percent oil,

including a reduction related to the pending divestiture of non-operated interests in the Eugene

Island 330 and South Marsh Island 128 fields." In the press release, Defendants caused EXXI to

estimate that its post-merger enterprise value would be approximately $6 billion.

148.    As the acquirer, EXXI was the parent corporation and EPL became its indirect,

wholly-owned subsidiary. Pursuant to the EPL Acquisition Agreement, one member of EPL's

board of directors (Defendant Griffiths) joined EXXI's Board (which otherwise remained intact),

and Defendant Schiller remained President, Chief Executive Officer, and Chairman of the Board

of EXXI following the acquisition.

149.    Faced with stagnant organic growth and a declining market price for EXXI

common stock since late 2013, however, Defendants caused the Company to acquire EPL in

2014 despite the fact that it continued to be overpriced.

150.    The announcement of the EPL acquisition in early 2014 temporarily slowed the

rate at which the market price for EXXI's common stock declined.

151.    However, the investing public was underwhelmed by the EPL acquisition, after

which the market price for EXXI's common stock resumed its rapid descent in the second half of

2014.

152.    When EXXI acquired EPL for approximately $2.3 billion, the purchase price of $39 per share for EPL represented a premium of 34% above the unaffected price for EPL common stock. A substantial portion of EPL's assets were the assets that EPL had only recently acquired from Hilcorp at a price that was 10% above the fair value determined by EXXI's Board for those same assets. In effect, when it acquired EPL, EXXI agreed to pay a premium on top of the premium that EPL had paid above the Board's determination of the fair value for the Hilcorp assets.

153.    To complete the EPL acquisition, Defendants caused EXXI to borrow $1 billion, effectively doubling the Company's total debt, increasing from $2.8 billion on March 31, 2014 (before the acquisition) to $5.6 billion on June 30, 2014 (after the acquisition).

154.    In a press release and a Current Report on Form 8-K filed with the SEC on June 2, 2014, EXXI announced it had completed its acquisition of EPL for approximately $2.3 billion, including $1.02 billion in cash, approximately 23 million shares of EXXI common stock and the assumption of $805 million of EPL debt. According to EXXI's press release, the acquisition made it the largest publicly traded independent operator on the Gulf of Mexico shelf.

155.    Following the EPL acquisition, EXXI changed EPL's method of accounting from successful efforts to full cost accounting to match the Company's own accounting method. After the acquisition, EPL's reported net property and equipment, including its oil and gas reserves, nearly doubled, rising from $1.9 billion as reported by EPL in its financial statements for the period ended March 31, 2014 (before the acquisition) to $3.2 billion as reported by EPL for the transition period ended June 30, 2014 (after the acquisition).

156.    Defendants caused EXXI to file its consolidated financial statements for the year ended June 30, 2014, on Form 10-K with the SEC on August 25, 2014, and amended on Form

10-K/A on December 23, 2014.

157.    The amended financial statements on Form 10-K and Form 10-K/A added Note 20 to the financial statements. Note 20 included condensed consolidating financial statements for all of EXXI's subsidiaries (including EPL for the first time). In the condensed consolidating financial statements, EPL and its subsidiaries are identified as the only "non-guarantors" of approximately $2.15 billion in senior notes issued in 2010, 2011, 2013 and 2014 by EGC, then a wholly-owned subsidiary of EXXI.

158.    The condensed consolidating financial statements in EXXI's Form 10-K/A purportedly set forth the financial statements of the "non-guarantors" – *i.e.*, EPL and its subsidiaries – separately.

159.    The financial statements of the "non-guarantors" set forth in Note 20 of EXXI's financial statements on Form 10-K and Form 10-K/A included $329 million in goodwill in the assets of the "non-guarantor" – *i.e.*, EPL and its subsidiaries.

160.    Following the EPL acquisition, EXXI's reported goodwill rose from zero reported by the Company in its financial statements for the period ended March 31, 2014 (shortly before to the acquisition), filed on Form 10-Q with the SEC on May 1, 2014, to $329 million reported by the Company in its June 30, 2014 financial statements (immediately after the acquisition).

161.    In addition to the $329 million in new goodwill reported by EXXI on June 30, 2014, in connection with the EPL acquisition, Defendants caused the Company to increase the reported net value of its oil and gas properties by $2.9 billion, from $3.6 billion in the Company's consolidated financial statements for the period ended March 31, 2014 (shortly before to the acquisition), to $6.5 billion in its consolidated financial statements for the year ended June 30, 2014 (immediately after the acquisition).

162.   Following the EPL acquisition, EXXI's reported total assets nearly doubled, rising from $4.1 billion as reported by the Company for the period ended March 31, 2014 (before the acquisition) to $7.4 billion reported by the Company for the period ended June 30, 2014 (after the acquisition).

163.   Defendants caused EXXI to file its consolidated financial statements for the period ended September 30, 2014, on Form 10-Q with the SEC on November 6, 2014, and amended on Form 10-Q/A on December 23, 2014.

164.   EXXI's September 30, 2014 financial statements included the $329 million in goodwill associated with the EPL acquisition. Defendants caused the Company to state in the notes to its September 30, 2014 consolidated financial statements: "we determined that performing a quantitative goodwill impairment test was unnecessary, and no goodwill impairment was recognized." However, as a result of then-current oil and natural gas market conditions, a qualitative goodwill impairment test was required, which the Company did not perform.

165.   Had EXXI conducted the required qualitative goodwill impairment test, it would have determined that the fair value of the reported carrying amounts of oil and gas reserves, including goodwill, had been impaired as a result of deterioration in forward pricing curves and an increase in the discount rate used to estimate fair value, both factors which adversely impact the fair value of its estimated reserves.

166.   Had EXXI conducted the required qualitative goodwill impairment test, the Company would have written off the entire amount of $329 million of goodwill paid by EXXI in the acquisition in the period ended September 30, 2014, just one quarter following EXXI's purchase of EPL, if not sooner.

34

167.    Because EXXI did not record a charge for impairment of goodwill, the Company reported a profit of $10 million from EPL's operations in the first quarter following the acquisition in EXXI's September 30, 2014 consolidated financial statements.

168.    In its September 30, 2014, consolidated financial statements, including the results for EPL, EXXI reported a net loss of $0.10 per share for the accounting period ended September 30, 2014 – its first full accounting period after acquiring EPL, compared with a net profit of $0.51 in the same quarter one year prior.

169.    However, had EXXI included the goodwill impairment charge of $329 million in its consolidated financial statements as it should have, the Company would have reported a net loss of at least approximately $3.57 per share for the first full quarter of operations after completing the EPL acquisition, providing a strong motive for EXXI not to report the impairment charge.

170.    In addition, had EXXI conducted the required qualitative impairment test for its other oil and natural gas properties in light of the deterioration in forward pricing curves and an increase in the discount rate used to estimate fair value, the Company would have written down the reported value of its other oil and natural gas reserves, not just the goodwill for the EPL acquisition, by material amounts in its September 30, 2014 financial statements on Form 10-Q and 10-Q/A.

171.    Had EXXI incurred an additional impairment charge for its other oil and natural gas properties as it should have, the Company would have reported a net loss substantially in excess of $3.57 per share for the first full quarter of operations after completing the EPL acquisition, providing a strong motive for EXXI not to report the additional impairment charge.

172.    EXXI filed its consolidated financial statements for the period ended December

31, 2014, on Form 10-Q with the SEC on February 9, 2015.

173.    In EXXI's December 31, 2014 consolidated financial statements, the Company eventually wrote off the $329 million goodwill impairment for EPL. EXXI did not timely report the $329 charge for goodwill impairment in its September 30, 2014, consolidated financial statements, which did not fairly present its financial condition or results of operations, making the financial statements materially false and misleading.

174.    By December 31, 2014, EXXI had written off all the goodwill it reported from the EPL acquisition. Over nine months, from March 31 to December 31, 2014, EXXI's goodwill went from zero to $329 million, then back to zero, following the EPL acquisition.

175.    Despite the continuing decline in oil and gas prices over the six-month period covered by those financial statements, EXXI did not write down the reported carrying value of any other oil and natural gas properties in the Company's December 31, 2014, financial statements.

176.    Had EXXI conducted the required qualitative impairment test for its other oil and natural gas properties in light of the continuing deterioration in oil and gas prices and forward pricing curves and an increase in the discount rate used to estimate fair value, the Company would have written down the reported value of its oil and natural gas reserves, not just the goodwill for the EPL acquisition, by approximately $683 million for EPL's oil and natural gas properties alone in its December 31, 2014 financial statements and would have written down the reported value of other oil and natural gas properties by hundreds of millions of dollars more.

177.    In EXXI's December 31, 2014 consolidated financial statements, the Company reported a net increase in oil and gas properties of approximately $122 million, reflecting a decrease in unevaluated properties and a corresponding increase in proved properties,

approximately $208 million of which the Company attributed to abandonment of certain of its ultra-deep activities.

178.    EXXI did not explain why it failed to report any impairment of its oil and gas properties, including those acquired by EPL, other than the impairment of goodwill in the December 31, 2014 consolidated financial statements.

179.    In EXXI's December 31, 2014 consolidated financial statements, which included EPL's results, the Company reported a net loss of just $315 million from EPL. However, the Company should have reported a net loss from EPL at least approximately $683 million greater than the loss it reported.

180.    EXXI's December 31, 2014 consolidated financial statements were materially false and misleading and did not fairly present the Company's financial condition or results of operations.

181.    In EXXI's December 31, 2014 consolidated financial statements, the Company reported a net loss of $386 million for the six-month accounting period. That loss included (a) $329 million of impaired goodwill from the EPL acquisition, (b) EPL's $315 million net loss, and (c) $60 million in increased interest expense on the debt EXXI incurred to complete the EPL acquisition.

182.    That is, as reported in EXXI's financial statements issued on December 31, 2014, over the first six months the following the EPL acquisition, EXXI reportedly lost at least $404 million on the acquisition. Those reported losses materially understated the Company's actual loss by hundreds of millions of dollars.

183.    Those reported results did not include the approximately $683 million charge the Company should have incurred for the impairment of EPL's oil and gas properties. In addition,

EXXI should have reported an additional charge of at least several hundred million dollars more for impairment of the Company's other oil and natural gas properties that it owned prior to the EPL acquisition, and would have incurred several hundred million dollars more in losses for the six-month accounting period.

184.    Despite the decline in oil and gas prices beginning in the second half of 2014, EXXI did not begin incurring charges for impairment of its oil and gas properties until its consolidated financial statements for the period ended March 31, 2015, which included EPL's assets and results, the Company wrote down its net property by $739.4 million reflecting impairment of its oil and gas properties. EXXI filed its March 31, 2015 consolidated financial statements on Form 10-Q with the SEC on May 8, 2015.

185.    In EXXI's consolidated financial statements for the period ended March 31, 2015, which included EPL's results, the Company reported a charge of $983 million for impairment of EPL's oil and natural gas properties. That charge for impairment of EPL's oil and gas properties should have been approximately $200 million higher than reported by EXXI.

186.    Inexplicably, after charging "only" $983 million for impairment of EPL's oil and natural gas properties, in the same consolidated financial statements, EXXI reclassified and eliminated the sum of $1.114 billion for impairment of EPL's assets, in effect artificially reducing the Company's expenses by $200 million and creating $200 million of phantom net operating income in its consolidated financial statements for the accounting quarter ended March 15, 2015.

187.    At the time, EXXI reported a $1.1 billion net operating loss. It did not explain the $200 million variance in its March 31, 2015 consolidated financial statements. Had it properly accounted for the impairment of all its oil and natural gas properties, including the assets

acquired from EPL, the Company would have reported a net operating loss at least $200 million greater than the loss it reported.

188.    EXXI's March 31, 2015 consolidated financial statements materially understated the Company's expenses and materially overstated its oil and natural gas reserves and net operating income, were materially false and misleading, and did not fairly present the Company's financial condition or results of operations.

189.    In EXXI's consolidated financial statements for the year ended June 30, 2015, filed on Form 10-K with the SEC on September 29, 2015, EXXI reported impairment of EPL's oil and natural gas properties for 2015 in the amount of $1.7 billion. However, it reclassified and eliminated only $120 million of that impairment.

190.    The reclassification and elimination of $120 million in EXXI's June 30, 2015 consolidated financial statements did not match the reclassification and elimination of the $1.114 billion impairment charge in the Company's March 31, 2015 consolidated financial statements, violating the accounting principle of consistency. The Company did not provide any explanation for the different accounting treatments.

191.    In EXXI's June 30, 2015 consolidated financial statements, the Company reported a net loss of $1.298 billion from EPL. That number nearly exactly equals the net amount of $1.3 billion that EXXI paid in cash and stock for EPL just one year earlier, meaning that the Company reported that it lost its entire cash investment in EPL in a year and was still left with the additional debt it assumed from EPL.

192.    In fact, EXXI incurred losses on EPL's oil and gas properties that were at least $350 million greater that the loss it reported, which would have been in excess of the purchase price paid for EPL.

193.   EXXI's June 30, 2015 consolidated financial statements materially understated the Company's expenses and materially overstated its oil and natural gas reserves and net operating income, were materially false and misleading, and did not fairly present the Company's financial condition or results of operations.

194.   In EXXI's consolidated financial statements for the year ended June 30, 2015, which also included EPL's assets and results, the Company wrote down its net property by $1.682 billion reflecting further impairment of its oil and gas properties. EXXI filed its 2015 consolidated financial statements on Form 10-K with the SEC on September 29, 2015.

195.   In EXXI's consolidated financial statements for the period ended September 30, 2015, which also included EPL's assets and results, the Company wrote down its net property by $904.7 million reflecting further impairment of its oil and gas properties. EXXI filed its September 30, 2015 consolidated financial statements on Form 10-Q with the SEC on November 9, 2015.

196.   In EXXI's consolidated financial statements for the period ended December 31, 2015, which also included EPL's assets and results, the Company wrote down its net property by $1.426 billion reflecting further impairment of its oil and gas properties. EXXI filed its December 31, 2015 consolidated financial statements on Form 10-Q with the SEC on February 16, 2016.

197.   Finally, in EXXI's consolidated financial statements for the period ended March 31,  2016, which also included EPL's assets and results, the Company wrote down its net property by $340.5 million reflecting further impairment of its oil and gas properties. EXXI filed its March 31, 2016 consolidated financial statements on Form 10-Q with the SEC on May 10, 2016.

198.    In total, over the five quarters beginning on January 1, 2015, and ending on March 31, 2016, just before EXXI filed for bankruptcy, the Company wrote down its consolidated net property by $5.093 billion as a result of impairment of its oil and gas properties. The impairment of the oil and gas property that EXXI purchased from EPL accounted for $2.607 billion, or slightly more than half of the Company's total reported impairment.

### E.    EXXI Is Forced to Restate Its Financial Statements

199.    Following the resignation of UHY on December 1, 2014, on the recommendation and approval of the Audit Committee of the Board, EXXI engaged UHY's acquirer, BDO, as its successor auditor on that same date. The Company announced the change in independent registered public accounting firms in a Current Report on Form 8-K filed with the SEC on or about December 2, 2014.

200.    On September 8, 2015, EXXI issued a press release and filed a Current Report on Form S-K with the SEC in which it announced that the Company's previously issued consolidated financial statements for the years ended June 30, 2014, 2013, 2012 and 2011 and for the quarters ended September 30, 2014 and 2013, December 31, 2014 and 2013, March 31, 2015 and 2014 and June 30, 2014 should no longer be relied upon and would be restated.

201.    According to the press release and the Form 8-K, the restatements were necessary to correct the Company's method of accounting for crude oil and natural gas hedging to reflect unrealized hedging gains and losses in its consolidated statements of operations as a component of earnings rather than on its consolidated balance sheets.

202.    The announcement of the restatements stunned the investment community, including Plaintiffs.

203.    Historically, EXXI elected to use cash flow hedge accounting, under which the

Company purportedly recorded unrealized gains and losses on its derivative contracts, net of the related tax impact, in accumulated other comprehensive income or loss as part of the consolidated balance sheet, until the production month when the associated hedge contracts were settled at which time gains or losses associated with the settled contracts were reclassified to revenues.

204.   In EXXI's financial statements for the years ended June 30, 2011, 2012, 2013, 2014, and 2015, filed with the SEC on August 26, 2011, August 9, 2012, August 21, 2013, August 28 and December 23, 2014, and September 29, 2015, Defendants caused the Company to state it did not use hedging for speculative or trading purposes. Those statements were materially false and misleading.

205.   At all relevant times, however, EXXI's hedging activities were substantially in excess of the hedging activities of similarly sized peer companies, and excessive given the volume of the Company's total oil and natural gas reserves.

206.   Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that Defendants caused EXXI to use hedging not to protect itself against oil and gas price declines but rather as speculative oil and natural gas investments or to manipulate revenue.

207.   During the preparation of its annual report on Form 10-K for the year ended June 30, 2015, EXXI and its auditor, BDO, determined that certain of the Company's oil and gas hedges did not qualify for cash flow hedge accounting treatment. EXXI and BDO determined that the Company's hedge documentation did not specify the hedged items and, therefore, the designations failed to meet the documentation requirements for cash flow hedge accounting treatment.

208.   As a result of that determination, EXXI was required to restate its previously

issued consolidated financial statements to reflect the unrealized recognition of gains and losses on derivative financial instruments described above. According to EXXI, the restatement also reflected resulting adjustments to net oil and natural gas properties, impairment of oil and natural gas properties and depreciation, depletion and amortization due to the previous inclusion of the value of the cash flow hedges in the Company's full cost ceiling test, which is only permitted if the derivative instruments qualify for cash flow hedge accounting; and adjustments to deferred income taxes and income tax expense.

209.    The restatement affected revenues, net income, and net income per common share for each accounting period affected, as well as total stockholders' equity. In announcing the restatement, EXXI stated that the adjustments would not impact the economics of the hedge transactions, nor would they affect net cash flows from operating, investing or financing activities, the Company's liquidity, or adjusted EBITDA for each restated reporting period.

210.    On September 14, 2015, EXXI filed a Notification of Late Filing on Form 12b-25 with the SEC in connection with the filing of its Form 10-K for the year ended June 30, 2015. The Company announced in the Form 12b-25 that its 2015 Form 10-K would include: (a) a restated balance sheet as of June 30, 2014, (b) restated audited consolidated statements of operations, consolidated statements of cash flows, and consolidated statements of stockholders' equity (deficit) for the years ended June 30, 2014 and 2013, (c) restated quarterly financial information for the quarters ended September 30, 2014 and 2013, December 31, 2014 and 2013, March 31, 2015 and 2014, and June 30, 2014, and (d) restated selected financial data for the years ended June 30, 2014, 2013, 2012, and 2011. According to the Form 12b-25, the Company could not complete the 2015 Form 10-K in a timely manner due to the additional time and effort involved in restating these consolidated financials.

211.   EXXI filed its delayed 2015 Annual Report on Form 10-K with the SEC on September 29, 2015. The 2015 Annual Report included the restated financial statements previously referred to in the Notification of Late Filing on Form 12b-25.

212.   Until EXXI's financial statements were corrected on September 29, 2015, the Company's publicly filed financial statements for the years ended June 30, 2013 and 2013, and for the quarters ended From September 30, 2013, through March 31, 2015, materially misstated and did not fairly and accurately present the Company's financial condition and its results of operations.

213.   Plaintiffs believe that, after a reasonable opportunity for discovery, the evidence will show that BDO required EXXI to restate its financial statements to eliminate cash flow hedge accounting not merely because the Company lacked adequate documentation for its hedging activities (a technical deficiency) but rather because the hedging was improper oil and natural gas speculation or was used improperly to manage reported revenue and earnings.

214.   EXXI's disclosure that it was required to restate its financial statements to eliminate cash flow hedge accounting was materially false and misleading because it made it appear that the reason for the restatement was a mere technical deficiency in documentation, when the true reason for the restatement was that the Company was hedging for improper purposes, including speculating on future oil and natural gas prices or manipulating reported revenue and earnings.

**F.   NGP/M21K**

215.   On or about December 23, 2009, EXXI offered $170 million in common stock and $100 million in 7.25% convertible preferred stock to the public pursuant to a prospectus filed on Form S-4 with the SEC on December 23, 2009.

216.    The hedge fund Mount Kellet Capital Management LP ("MK"), of which Defendant Louie was a Managing Partner, acquired approximately 14.5 million shares of common stock and 150,000 shares of 7.25% convertible preferred stock in the offering. According to MK's Form 13G filed with the SEC on December 21, 2009, the hedge fund beneficially owned approximately 21 million shares of EXXI common stock after the offering with an aggregate value of approximately $42.6, representing 8.2% of the Company's outstanding common stock, making MK one of the Company's largest shareholders.

217.    On January 28, 2010, EXXI completed a 5:1 reverse stock split.

218.    According to MK's Form 13G filed with the SEC on March 31, 2010, the hedge fund owned approximately 3.2 million shares of EXXI common stock after the reverse stock split.

219.    In 2010, 2011, and 2012, EXXI common stock comprised between 10% and 20% of the hedge fund MK' total assets. In each of those years, MK was one of the Company's two or three largest shareholders.

220.    In 2013, 2014, and 2015, EXXI common stock was either the hedge fund MK's first, second, or third largest investment in total dollars invested. In 2013 and 2014, a least, MK was one of the Company's two or three largest shareholders.

221.    In or about February 2012, EXXI and the MK hedge fund formed a subsidiary, Energy XXI Natural Gas Partners, LLC ("EXXI NGP"), of which EXXI owned 20% and MK owned 80%. Through its wholly-owned subsidiary, Natural Gas Partners Assets, LLC ("NGP"), EXXI NGP engaged in the acquisition, exploration, development, and operation of oil and natural gas properties in Louisiana and Texas and offshore in the Gulf of Mexico.

222.    In or about December 2012, EXXI NGP was renamed EXXI M21K, LLC ("EXXI

45

M21K") and NGP was renamed M21K, LLC ("M21K").

223.    On or about April 1, 2014, M21K purchased $123 million of oil and natural gas properties from EXXI.

224.    In the Current Report on Form 8-K, filed with the SEC on December 15, 2014, announcing Defendant Louie's appointment to the Board, Defendants caused EXXI to state that there were no related party transactions between Louie and the Company or any of its subsidiaries that would require disclosure pursuant to Item 404(a) of Regulation S-K.

225.    That statement in the Current Report on Form 8-K was materially misleading because (a) Louie had loaned Defendant Schiller $3 million and the loan was outstanding at the time the Form 8-K was filed, (b) Louie was at least indirectly interested in the hedge fund MK's ownership of EXXI common stock, (c) Louie was at least indirectly interested in the M21K partnership between the Company and MK, and (d) Louie was at least indirectly interested in M21K's $123 million asset purchase from EXXI in 2014. All of those transactions were related party transactions requiring disclosure pursuant to Item 404(a) of Regulation S-K.

**NO SAFE HARBOR**

226.    The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged in this Complaint. None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

227.    In the alternative, to the extent that the statutory safe harbor does apply to any

statement pleaded herein which is deemed to be forward-looking, Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew or recklessly disregarded the fact that such forward-looking statements were materially false or misleading or omitted facts necessary to make statements previously made not materially false and misleading, or that each such statement was authorized or approved by a director or senior executive officer of EXXI who actually knew or recklessly disregarded the fact that each such statement was false or misleading when made.

228.   None of the historic or present tense statements made by Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION / ECONOMIC LOSS

229.   As alleged herein, Defendants engaged in a scheme to deceive the investing market generally, and Plaintiffs in particular, and a course of conduct that artificially inflated EXXI's stock price and operated as a fraud or deceit on purchasers of EXXI stock by misrepresenting the Company's financial and operating condition and prospects as well as known trends in its industry.

230.   Once Defendants' misrepresentations and fraudulent conduct were disclosed to the market, EXXI's stock price reacted negatively as the artificial inflation was removed from it. As a result of their purchases of EXXI stock alleged herein, and their decision to refrain from selling EXXI stock alleged herein, Plaintiffs suffered significant economic losses.

231.    Defendants' false and misleading statements had the intended effect and caused EXXI stock to trade at artificially inflated levels at all relevant times and caused Plaintiffs to refrain from selling EXXI stock.

232.    As investors and the market became aware of EXXI's prior misstatements and omissions and that EXXI's actual financial condition and business prospects were, in fact, not as represented, EXXI's stock price reacted negatively, substantially damaging Plaintiffs.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

233.    At all relevant times, the market for EXXI's  common stock was an efficient market for the following reasons, among others:

(a)    at all relevant times, EXXI's common stock was listed and actively traded on the NASDAQ Global Select Market, a highly efficient and automated market;

(b)    at all relevant times, on average, hundreds of thousands of shares of EXXI common stock were traded on a weekly basis, demonstrating a very active and broad market for the stock and permitting a very strong presumption of an efficient market;

(c)    as a regulated issuer, EXXI filed periodic public reports with the SEC at all relevant times;

(d)    at all relevant times, EXXI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    at all relevant times, EXXI was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and

certain customers of their respective brokerage firms, each of which was publicly available and entered the public marketplace;

(f)     FINRA member firms were active market-makers in EXXI common stock at all relevant times; and

(g)     at all relevant times, unexpected material news about EXXI was rapidly reflected and incorporated into the Company's stock price, which were the prices paid by Plaintiffs for their shares.

234.   As a result of the foregoing, the market for EXXI's common stock promptly digested current information regarding EXXI from all publicly available sources and reflected such information in EXXI's stock price. Under these circumstances, Plaintiffs, as well as all other public investors who purchased or held of EXXI's common stock at market prices, suffered injury through their purchases of EXXI's common stock at artificially inflated market prices, and a presumption of reliance applies.

### FIRST CLAIM
### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT
### AND RULE 10B-5 PROMULGATED THEREUNDER
### AGAINST ALL DEFENDANTS

235.   Plaintiffs repeat each and every allegation contained above as if fully set forth herein.

236.   At all relevant times, Defendants carried out a plan, scheme and course of conduct which was intended to and did: (1) deceive the investing public, including Plaintiffs in particular, as alleged herein; and (2) cause Plaintiffs to purchase EXXI's common stock at artificially inflated prices and hold their shares when it was no longer prudent for them to do so. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions alleged herein.

237.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact about EXXI's financial and operating condition and prospects or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs as purchasers and holders of the Company's common stock in an effort to maintain artificially high market prices for EXXI's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

238.    Defendants are sued either as primary participants in the wrongful and illegal conduct alleged herein or as controlling persons as alleged below.

239.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of EXXI as specified herein.

240.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EXXI's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts about EXXI's financial and operating condition and prospects and omitting to state material facts necessary in order to make the statements made about EXXI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as alleged more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon Plaintiffs as purchasers and holders of EXXI's common stock.

241. Defendants' primary liability arises from the following facts: (1) Defendants were senior executive officers or directors of the Company; (2) by virtue of their senior executive and Board positions and responsibilities and activities, the Individual Defendants were privy to and participated in the creation, development, and reporting of the Company's financial condition; (3) the Individual Defendants enjoyed significant personal contact and familiarity with the Company and its other officers and directors and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) Defendants were aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

242. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The material misrepresentations or omissions made by Defendants or at their behest were made knowingly or recklessly and for the purpose and effect of concealing EXXI's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.

243. As demonstrated by the misstatements and omissions of material fact alleged above which they caused or permitted the Company to make, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

244. As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts by Defendants or at the behest of the Individual Defendants, as set forth above, the market price of EXXI's common stock was artificially inflated at all relevant times.

245.   In ignorance of the fact that market prices of EXXI's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by or at the behest of the Individual Defendants, or upon the integrity of the market in which the common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants or at the behest of the Individual Defendants at all relevant times, Plaintiffs acquired EXXI common stock at artificially high prices, held those shares when it was not prudent to do so, and were greatly damaged thereby.

246.   At the time of said misrepresentations and omissions, Plaintiffs were unaware of their falsity, and believed them to be true. Had Plaintiffs and the investing public known the truth regarding EXXI's false statement, which were not disclosed by Defendants, Plaintiffs and other public investors would not have purchased or otherwise acquired their EXXI common stock or, would not have done so at the artificially inflated market prices that they paid, and Plaintiffs would not have held onto their stock when it was not prudent to do so.

247.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

248.   As a direct and proximate result of the Individual Defendants' wrongful conduct as control persons, Plaintiffs have suffered substantial damages in connection with their respective purchases and of the Company's common stock in amounts to be proven at trial.

249.   This action was filed within two years of discovery of the fraud and within five

years of each Plaintiff's own purchases of EXXI securities giving rise to this cause of action.

## SECOND CLAIM
## VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
## AGAINST THE INDIVIDUAL DEFENDANTS

250.    Plaintiffs repeat each and every allegation above as if set forth herein at length.

251.    The Individual Defendants acted as controlling person of EXXI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, or ownership and contractual rights, participation in or awareness of the Company's operations, and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the Company's decision-making and disclosure practices, including the content, timing, and dissemination of the various statements that Plaintiffs allege were false and misleading.

252.    The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

253.    In particular, Defendant Schiller had direct and supervisory involvement for all the operations of the Company and, therefore, had the power to control or influence all the transactions giving rise to the securities violations as alleged herein, and exercised the same.

254.    As alleged above, Defendant Schiller violated Section 10(b) and Rule 10b-5 by the acts and omissions as alleged in this Complaint.

255.    By virtue of his position as a controlling person, Defendant Schiller is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants'

wrongful conduct, Plaintiffs suffered significant damages in connection with their purchases and sales of the Company's common stock alleged herein.

256.    In particular, Defendant Griffin, as Chief Financial Officer of EXXI, had direct and supervisory involvement for preparation of the Company's financial statements and, therefore, had the power to control or influence the issuance and dissemination of the false financial statements that give rise to the securities violations as alleged herein, and exercised the same.

257.    As alleged above, Defendant Griffin violated Section 10(b) and Rule 10b-5 by the acts and omissions as alleged in this Complaint.

258.    By virtue of his position as a controlling person, Defendant Griffin is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered significant damages in connection with their purchases and sales of the Company's common stock alleged herein.

259.    In particular, Defendants Colvin (as Chairman), Flannery, and Griffiths, as members of the Audit Committee of the Board of EXXI, had supervisory responsibility for preparation of the Company's financial statements and, therefore, had the power to control or influence the issuance and dissemination of the false financial statements that give rise to the securities violations as alleged herein, and exercised the same.

260.    As alleged above, Defendants Colvin, Flannery, and Griffiths violated Section 10(b) and Rule 10b-5 by the acts and omissions as alleged in this Complaint.

261.    By virtue of their positions as a controlling person, Defendants Colvin, Flannery, and Griffiths are liable pursuant to Section 20(a) of the Exchange Act.

262.    As a direct and proximate result of the wrongful conduct of the Individual

Defendants, Plaintiffs suffered significant damages in connection with their purchases and sales of the Company's common stock alleged herein in amounts to be proven at trial.

263.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## THIRD CLAIM
## FRAUD
## AGAINST ALL DEFENDANTS

264.    Plaintiffs repeat the allegations in paragraphs 1 through 234 above as if fully set forth herein.

265.   As alleged herein, Defendants made or caused EXXI to make materially false and misleading statements about EXXI's financial and operation condition and prospects.

266.   Defendants knew that the statements they made or caused EXXI to make about EXXI's financial and operation condition and prospects were materially false and misleading statements as alleged herein.

267.   Defendants made or caused EXXI to make the materially false and misleading statements alleged herein intending that Plaintiffs and the other public investors would rely upon them to their detriment.

268.   At all relevant times, Plaintiffs and the other public investors did not know, and in the exercise of reasonable care could not have known, that the statements Defendants made or caused EXXI to make were materially false and misleading as alleged herein.

269.   Plaintiffs and the other public investors reasonably relied upon the materially false and misleading statements that Defendants made or caused EXXI to make as alleged herein when they purchased and held EXXI common stock.

270.   In reasonable reliance upon the materially false and misleading statements that

Defendants made or caused EXXI to make as alleged herein, Plaintiffs purchased EXXI common stock at artificially inflated prices or held onto those shares when it was not prudent for them to do so.

271.   As a proximate and foreseeable result of Defendants' fraud, Plaintiffs have suffered substantial injury and damages in amounts to be proven at trial.

**FOURTH CLAIM**
**BREACH OF FIDUCIARY DUTY**
**AGAINST THE INDIVIDUAL DEFENDANTS**

272.    Plaintiffs repeat the allegations in paragraphs 1 through 234 above as if fully set forth herein.

273.   As directors and senior executive officers of EXXI, the Individual Defendants owed fiduciary duties of loyalty and care to the Company and its shareholders, including Plaintiffs and the Company's other public stockholders.

274.   As alleged herein, the Individual Defendants breached their fiduciary duties in at least the following ways:

275.   The Individual Defendants concealed and covered their breaches of fiduciary duty, and the adverse impact caused thereby to the Company and indirectly to its shareholders, including Plaintiffs, by making or causing the Company to make the materially false and misleading statements about the Company's financial and operating condition and prospects alleged herein.

276.   The Individual Defendants' breaches of fiduciary duty alleged herein had a substantial adverse effect upon EXXI, burdening the Company in billions of dollars of debt to acquire underperforming assets without adequate diligence, and to do so at excessive prices, to create the false illusion of growth and prosperity to protect their own financial interests at the

expense of the Company and its shareholders, including Plaintiffs.

277.   The Individual Defendants concealed and covered the substantial adverse effect upon EXXI of their breaches of fiduciary duty by making or causing the Company to make the materially false and misleading statements about the Company's financial and operating condition and prospects alleged herein.

278.   As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty alleged herein, the Company directly, and Plaintiffs as its shareholders indirectly, suffered massive losses in amounts to be proven at trial.

279.   Eventually, by virtue of the excessive debt burden the Individual Defendants caused EXXI to take on to acquire underperforming assets, without adequate diligence, at excessive prices, the Company was compelled to seek protection under Chapter 11 of the Bankruptcy Code on April 16, 2016.

280.   The Individual Defendants' breaches of fiduciary duty were intertwined with the materially false and misleading statements they made or caused the Company to make about the Company's financial and operating condition and prospects alleged herein.

281.   Because the materially false and misleading statements that the Individual Defendants made or caused the Company to make about the Company's financial and operating condition and prospects were intertwined with and related to the Individual Defendants' breaches of fiduciary duty alleged herein, the claim for breach of fiduciary duty against the Individual Defendants survived the Company's bankruptcy and may be asserted directly by Plaintiffs as former shareholders of the Company.

282.   The claim for breach of fiduciary duty asserted herein was not released in the Plan of Reorganization approved by the Bankruptcy Court or by the Company's reorganization. To

the contrary, the claim for breach of fiduciary duty was excluded from the release and discharge of claims in the Plan of Reorganization.

283.   Because the materially false and misleading statements that the Individual Defendants made or caused the Company to make about the Company's financial and operating condition and prospects were intertwined with and related to the Individual Defendants' breaches of fiduciary duty alleged herein, Plaintiffs are not required to make a pre-suit demand on the Board of EGC to bring this claim for breach of fiduciary duty against the Individual Defendants.

## PRAYER FOR RELIEF

Plaintiffs request relief and judgment as follows:

(a)   awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

(b)   awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)   awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  September 5, 2017

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:      s/ Mark C. Rifkin
Mark C. Rifkin
Randall S. Newman
270 Madison Ave.
New York, NY 10016
Tel:    (212) 545-4600
rifkin@whafh.com

*Attorneys for Plaintiffs*